# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| GLENN ELLIOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:16-cv-00631-JHE |
| | ) | |
| CITY OF PLEASANT GROVE, | ) | |
| ALABAMA, et al., | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM OPINION[1]

On April 19, 2016, Defendants City of Pleasant Grove, Alabama, Chief Robert Knight, Officer Allen Bagwell, and Officer Bill Vick removed this action from the Circuit Court of Jefferson Count, Alabama. (Doc. 1). In the amended complaint, Plaintiff Glenn Elliott ("Elliott") asserts claims pursuant to 42 U.S.C. § 1983 against Officer Bagwell and Officer Vick for unlawful seizure and excessive force and state law claims for intentional inflection of emotional distress, negligence, false imprisonment, false arrest, and assault and battery against the officers. (Doc. 1-2). Elliott also asserts § 1983 claims against the City and Chief Knight alleging failure to train or supervise and a failure to enforce polices or procedures. (*Id.*). Defendants move for summary judgment as to all of Elliott's claims. (Doc. 13). The motion is fully briefed and ripe for review. (Docs. 13, 15, & 18). For the reasons stated more fully below, the motion for summary judgment (doc. 13) is **GRANTED**.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 5).

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere

'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

### A. The Incident at the Chevron Gas Station

The allegations in the complaint arise from an altercation that occurred on November 6, 2013. (Doc. 13-2, conventionally filed CD with security camera footage of the incident). Elliott testified that, on the evening in question, he believed he had a flea infestation in his home. (Doc. 13-4 at 13 (46:18-22)). To dispose of the fleas, he purchased "bug bombs" to set off throughout his house. (*Id.* (47:11-19)). Due to the toxicity of the bug bombs, Elliott and his wife were staying at his mother's house that night. (*Id.* (47:20-23)). That evening, Elliot and his wife had dinner at Elliott's mother's house, and afterwards Elliott went back home to set off the bug bombs – around 10:00 PM. (*Id.* (47:15-19, 48:3-9)).

Prior to leaving his house, Elliott went to his refrigerator to get a Mountain Dew. (Doc. 13-4 at (48:16-20)). He saw a handgun, a Kel-Tec .380 caliber pistol, sitting on top of the refrigerator, and he decided to take it with him. (*Id.* (48:16-22)). Elliott testified: "[I] just stuck it in my back pocket and went out the door." (*Id.* at 14 (52:16-17)). On the way back to his mother's house, Elliott decided to go to the Pleasant Grove Chevron to buy two more Mountain Dews and a pack of cigarettes. (*Id.* at 41 (157:8-10)).

The entire encounter between Elliot and the officers was captured on Chevron's video surveillance system. (Doc. 13-2). Elliott testified that "the tape pictures pretty much tell the story." (Doc. 13-3 at 54 (212:13-14)). At approximately 10:58 PM, Elliott entered the Chevron. (Doc. 13-2). The barrel of a .380 caliber handgun was visibly handing out of a hole in his back-right

pocket. (*Id.*). Michael Wood, the gas station attendant, attested: "Elliot entered the store, and it was immediately apparent that he had a pistol hanging out of a hole in his back right pocket." (Doc. 13-7 at 2). As Elliott moved through the store, he stopped in front of what appears to be a refrigerator filled with bottled drinks. (Doc. 13-1). Officer Vick alerted Officer Bagwell to the gun in Elliott's pocket. (Doc. 13-6 at 2). As Elliot bent over to remove a drink from the refrigerator, the angle of the gun was such that it was on a horizontal plane and pointing in a (presumably) unsafe direction. (Doc. 13-2; *see* doc. 13-3 at 2). Officer Vick noticed the handgun and observed that it was pointed in his general direction, Officer Bagwell's general direction, and could possibly be pointed at any member of the public who would walk into the gas station, as well as individuals outside the station pumping gas. (Doc. 13-5 at 2, doc. 13-6 at 2). There were three or four other people in the gas station store. (Doc. 13-4 at 35 (134:4-5)). One of the officers said "hey you," and Elliott testifies he did not know who the officer was talking to. (*Id.* at (134:4-9)).

Officer Bagwell and Officer Vick approached Elliot to talk to him about the public safety risk that his unsecured weapon presented, and Officer Bagwell asked Elliott to keep his hands on the counter. (Doc. 13-5 at 2-3). One of the officers asked Elliott what was in his back pocket. (Doc. 13-4 at 35 (134:19-21)). Officer Bagwell attests that Elliott then "reached for his firearm." (Doc. 13-5 at 3). Officer Vick attests that "Elliot then reached for his right back pocket, where the gun was located." (Doc. 13-6 at 3). Elliott testified: "I made a move. I wasn't going to pull it out, I was going to pat my back pocket." (Doc. 13-4 at 35 (134:22-23)).

Seeing that Elliott was reaching toward his weapon, Officer Bagwell restrained Elliott by the right arm. (Doc. 13-5 at 2) ("I applied control to the arm by pulling up on the elbow and using my left arm to control his wrist."). Elliott fought back against Officer Bagwell's hold. (Doc. 13-

7 at 3).  Elliott testified he "was debating on tangling" with Officer Bagwell, but denied "siz[ing] him up."  (Doc. 13-4 at 47 (183:20 – 184:6)).  Elliott explains "he grabbed me by the arm and twisted it up" and "ended up bending me over the counter."  (Doc. 13-4 at 35 (135:1, 10-11)).[2] Officer Vick disarmed Elliott, removed the magazine from the pistol, and cleared the bullet from the chamber of the pistol.  (Doc. 13-6 at 3).  Elliott testified that the gun "wasn't loaded," but "[h]ad a clip in it, but no round [in the chamber]."  ((Doc. 13-4 at 19 (72:14-21)).  Officer Vick placed the magazine, pistol, and single bullet on top of a case of sodas siting on the gas station counter.  (Doc. 13-2; doc. 13-6 at 3).  Elliot told the officers he had a concealed carry permit.  (Doc. 13-4 at 44 (170:1-5)).  Officer Vick removed Elliott's wallet and verified that he did have a concealed carry permit.  (Doc. 13-6 at 3).

Officer Bagwell released Elliott at approximately 11:00 PM, being restrained by the officers for less than two minutes.  (Doc. 13-2).  Elliott then paid for the items he had brought to the counter.  (Doc. 13-7 at 3).  Elliott picked up his bag of Mountain Dews with his right hand.  (*Id.*).  Elliott testified he had no problem with the officers checking his concealed carry permit.  (Doc. 13-4 at 36 (137:18-20)).  The store clerk did not hear Elliott tell the officers of any injury or pain resulting from the encounter.  (Doc. 13-7 at 3).

Officer Bagwell and Officer Vick walked Elliott out of the gas station.  (Doc. 13-5 at 3).  When they reached Elliott's vehicle, Officer Vick returned Elliott's magazine, pistol, and bullet.  (*Id.*; doc. 13-6 at 3).  Elliott testified that at this point he was "free to go" and that he "could have left anytime."  (Doc. 13-4 at 45 (176:2-4)).  Elliott spoke with the officers about the other guns in

---

[2] During his deposition, Elliott testified the officer then "slammed my head down on the credit card machine."  (Doc. 13-4 at 35 (135:12)).  Elliott does not offer this fact in his brief, likely because it is contradicted by the video evidence of the incident, which shows Officer Bagwell applying additional pressure to his right arm and lowering his upper body over the counter.  (*See* doc. 13-2).

his collection and about how he liked the gun he was carrying.  (*Id.*at 35-36 (136:9 – 137:13)). The officers walked back into the store at approximately 11:03 PM.  (Doc. 13-2).  Elliott can be seen driving away from the Chevron in a green pickup truck at approximately 11:04 PM.  (*Id.*). The entire encounter between Elliott and the officers lasted less than five minutes.  (*Id.*).

Elliott testified he owns "about a hundred" firearms.  (Doc. 13-4 at 16 (58:11-16)).  He testified he regularly carries the Kel-Tec .380 pistol that he was carrying on November 6, 2013 (carrying it every day to work), as well as a Glock .45 caliber handgun that he normally carries in a shoulder holster.  (*Id.* at 14, 45 (50:4-8, 173:15-22)).  Although Elliott testified he never had taken a firearm safety class, he did state that he was trained by his father, who was a reserve police officer for the City of Pleasant Grove, in the proper way to handle firearms and had hunted (with guns) for years.  (*Id.* at 15-16, 19 (50:6-12, 54: 8-12, 59:14-22, 72:5-7)).  Elliott testified he imparted the same rules for gun handling to his children when teaching them the lessons of proper firearm safety.  (*Id.* at 16 (59:5-13)).  Among the lessons his father taught him was not to "point [a gun] at nobody and always treat it as if it was loaded," "[a]lways be sure what you are shooting at[; that] [t]here is nothing behind you or past you that might be . . . in that line of fire" and that you should always be sure of where the muzzle of the pistol is pointing because it is always dangerous for a firearm to be pointed at someone.  (*Id.* at 20 (73:10-23, 74:1-5).  Elliott testified he was taught to carry firearms in a secure manner and that it was important to follow firearm safety rules for the benefit of public safety.  (*Id.* at 21-22 (77:5-17. 83:15-17)).

### B.  Elliott's Medical History

Elliott has a history of chronic and acute health issues, particularly of the knee and lower back.  (Doc. 13-4 at 12 (41:3-13)).  He broke his back, near his tailbone, twice playing football in school, which subsequently contributed to arthritis of the lower back.  (*Id.* at 9 (29:19 – 30:10)).

Also, Elliot was in an accident while riding his motorcycle when he was seventeen, breaking bones and severely injuring his shoulder, which he never had repaired. (*Id.* at 7 (22:21 – 23:11)). Subsequent treatment at Lloyd Nolan hospital led Elliot to an addiction to morphine and pain pills, which lasted until June 2016. (*Id.* at 11 (37:7 – 40:8)). About twenty years ago, Elliott had another motorcycle accident that "shattered his knee joint" causing a shortening of his right leg, which has negatively affected his left hip and his back. (*Id.* at 7, 12-13 (22:2-11, 43:15 – 45:13)). Elliot underwent back surgery due to spinal stenosis within the past several years. (Doc. 13-4 at 8-9 (28:12 – 28:1)).

Fifteen years ago, Elliot had his first heart attack and had been in the care of a cardiologist since that time. (Doc. 13-4 at 7 (24:14-16)). Since that time, he has had a quadruple bypass and numerous stints put in. (*Id.* at 8 (27:9 – 28:11)). Elliott, who left his job due to his heart condition, testified: "I was having so much trouble with it and my artery disease, whatnot, that I just got to where I couldn't walk in the amount of stuff that it'd take to do the job I was doing." (*Id.* at 25 (95:7-11, 96:21-22)).

Elliott testified his arm hurt and he couldn't lift his arm as high. (*Id.* (99:20-22)). Although explaining he was having an issue with his arm staying numb two weeks prior to the incident, (*id.* at 9 (31:8-15), Elliott testified nothing was wrong with his shoulder before the incident. (*Id.* at 36 (140:1-3)). Elliott testified that he lives on a fixed-income, (*id.* at 25 (93:16-17)), and that he did not believe he had enough money to seek further medical treatment, (*id* at 27 (101:13-23)). Although he was evaluated by his neurosurgeon (who Elliott says recommended further testing and possibly an MRI), (*id.* (101:13-17), Elliott does not allege any medical bills as damages, as he testified "as of right now, I don't have any bills that tie to this. (*Id.* (103:1 – 104:1)).

### C. City Police Training and Policy

Elliott testified he does not know what type of training Officer Bagwell and Officer Vick received. (Doc. 13-4 at 30 (116:16-19)). Elliott also testified he has "no idea" about the "policies and procedures" and "rules and regulations" of the city, (*id.* at 33 (126:18-21)), and that he does not know anything about the City's use of force policy, (*id.* at 40 (154:5-9)). As to Chief Knight, Elliott testified he doesn't have any evidence that Chief Knight had knowledge of any alleged issue with any of the City's officers. (*Id.*, at 39 (151:3-17)).

Although clarifying that Officer Vick could have helped to prevent what happened, Elliott agreed that he had no complaint against Officer Vick, (*id.* at 51 (197:11-20), and had no complaint against Chief Knight, (*id.* at 39 (149:6-12)).

### III. Analysis

Count I of Elliott's complaint alleges violation of his rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments against Officer Bagwell and Officer Vick, specifically the prohibition against the use of excessive force and unlawful seizure. (Doc. 1-2 at ¶10). Elliott also asserts state law claims against Officer Bagwell and Officer Vick including Count II for intentional infliction of emotional distress (*id.* at ¶ 13), Count III for negligence (i.e., negligently breaching their duty "not to touch [Elliott] in the manner they did") (*id.* at ¶ 16), Count IV for false imprisonment (*id.* at ¶ 16), and Count V for assault and battery (*id.* at ¶ 21). Counts VI and Count VII of Elliott's complaint assert claims against Chief Knight and the City of Pleasant Grove pursuant to § 1983, for failure to train and failure to enact or enforce policies, respectively.

### A. 42 U.S.C. § 1983 Claims Against Officer Bagwell and Office Vick[3]

Elliott's § 1983 claims are based on allegations of an unlawful seizure and use of excessive

---

[3] To the extent Elliott alleges any constitutional claims in his amended complaint other

force.

### 1. Unlawful Seizure Claim – The Initial Stop

Elliott asserts he was unlawfully seized by Officer Bagwell and Officer Vick in violation of the Fourth and Fourteenth Amendments. Seizures of the person, including brief investigatory stops, are analyzed under the Fourth Amendment. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Such an investigatory stop, or "*Terry* stop," must be justified by some objective manifestation that the person stopped is, or is about to be engaged in criminal activity. *Id.* The name "*Terry* stop" comes from the standards established in *Terry v. Ohio*, wherein the Court explained that an "officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. 1, 22 (1968). The "reasonable suspicion" required for an officer to make a *Terry* stop "does not deal with hard certainties, but with probabilities." *Cortez*, 449 U.S. at 418. For example, the Eleventh Circuit has explained that officers may detain an individual "to inquire further into a possible concealed-weapons violation." *United States v. Lewis*, 674 F.3d 1298, 1306 (11th Cir. 2012).

Officer Bagwell and Officer Vick were justified when they stopped to talk to Elliott inside the Chevron gas station because they had a "reasonable suspicion" that Elliott was committing a crime, i.e., a weapons violation. Prior to stopping Elliott, Officer Bagwell and Officer Vick saw an unsecured firearm partially exposed in one of Elliott's back pockets. (Doc. 13-6 at 2). Due to the unsecured nature of the firearm, the barrel of the firearm was on a horizontal plane and pointing

---

than those addressed in this memorandum opinion, they are deemed abandoned, as they were not argued at summary judgment. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

in an unsafe direction.[4]  (Doc. 13-2; *see* doc. 13-3 at 2, doc. 13-5 at 2, doc. 13-6 at 2).  According to Michael Wood, the gas station attendant, "Elliott entered the store, and it was immediately apparent that he had a pistol hanging out of a hole in his back right pocket."  (Doc. 13-7 at 2).

Alabama law provides: "No person shall carry a pistol about his person on private property not his own or under his control unless the person possesses a valid concealed weapon permit . . . ."  ALA. CODE § 13A-11-52 (1975).  Alabama is an "open carry" state, meaning that an individual does not need a permit to openly carry a pistol.  However, Alabama's disorderly conduct statute states: "It shall be a rebuttable presumption that the mere carrying of a visible pistol, holstered or secured, in a public place, in and of itself, is not a violation of this section."  ALA. CODE § 13A-11-7 (1975).

The officers observed Elliott carrying a pistol that was neither holstered nor secured and that changed angles as Elliott bent over to reach into the cooler. These undisputed facts created a "reasonable suspicion" such that it was within Officer Bagwell and Officer Vick's discretion to conduct a *Terry* stop to determine Elliott's compliance with applicable state laws regarding carrying a firearm.  Eleventh Circuit law is clear that law enforcement officers can lawfully stop an individual to determine their compliance with concealed weapon laws.  *Lewis*, 674 F.3d 1306.  Despite Elliott's contentions, whether the weapon is loaded or whether anyone in the gas station showed any sign of fear, (doc. 15-1 at 1, 5), is irrelevant.  It is illogical and unsafe to require an officer to assume a gun is not loaded or to rely on whether civilians exhibit any awareness of a threat.  Additionally, neither Officer Bagwell nor Officer Vick physically restrained Elliott until

---

[4] Although Elliott's brief points out that the visible component of the firearm may have been the handle (and not the barrel) (doc. 15-1 at 5), Elliott testified that it was the barrel of the firearm that was exposed through the hole in his pocket, (doc. 13-4 at 42 (163:8-12).  Regardless of which end of the firearm protruded through the hole in Elliott's pocket, the firearm was unsecured.  (*See* doc. 13-2).

after Elliott reached toward his firearm. There is no evidence that the initial investigatory stop to inquiry about the status of Elliott's weapon was not justified.

### 2. Unlawful Seizure and Excessive Force Claims – Physical Restraint

Elliott also contends the officers' use of force in restraining him was not justified. It has long been recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *Graham v. Conner*, 490 U.S. 366, 396 (1989) (citing *Terry*, 392 U.S. at 22-27). However, that use of force must be "reasonable." Because the Fourth Amendment's reasonableness test is not capable of precise definition or mechanical application, its application requires careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). The "reasonableness" of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Id.* This inquiry is limited to what the officer knew at the time he used force. *Saucier v. Katz*, 531 U.S. 991 (2001).

It is undisputed that, when Officer Bagwell and Officer Vick approached Elliott to inquire about the status of his unsecured firearm, Elliott reached toward his pistol. (Doc. 13-5 at 3, Officer Bagwell: "[Elliott] reached for his firearm." / Doc. 13-6 at 3, Officer Vick: "Elliot then reached for his right back pocket, where the gun was located." / Doc. 13-4 at 35 (134:22-23), Elliott: "I made a move. I wasn't going to pull it out, I was going to pat my back pocket." / Doc. 15-1 at 5, Elliott's brief "[Elliott] went to pat his pocket after the Officers asked what was in his pocket."). Elliott's act of reaching toward his pistol justified Officer Bagwell using a reasonable amount of force to restrain him. It does not matter if Elliott meant to reach toward his gun or merely intended

to reach toward his other back pocket, because reasonableness is viewed from the perspective of the officer at the time the force is used. (*See* doc. 15-1 at 5); *Graham*, 490 U.S. at 396; *Saucier*, 531 U.S. at 991. Elliott's argument that the officers were limited to "stopping and frisking for weapons" is without merit. (*See* doc. 15-1 at 11). When Elliott reached toward his weapon, the situation escalated and the use of greater force became justified.

As Elliott reached toward his back pockets, where his weapon was located, Officer Bagwell restrained Elliott by taking his right arm, applying control to the arm by pulling up on the elbow and using his left arm to control the wrist. (Doc. 13-5 at 2). Elliott does not dispute that he fought back against Officer Bagwell and "was debating on tangling" with him. (Doc. 13-7 at 3, doc. 13-4 at 47 (183:20 – 184:6)). At this point, Officer Bagwell tightened his restraint and bent Elliott forward over the counter so that Officer Vick could disarm him. (Doc. 13-4 at 35 (135:1, 10-11)). Based on these undisputed facts, Officer Bagwell was justified in seizing and using a reasonable amount of force to restrain Elliott, who had reached toward his gun when approached by two law enforcement officers. There is no evidence Officer Bagwell's use of force to restrain Elliott after he reached toward his firearm was unreasonable, and there is no constitutional violation based on such restraint.

Simply put, Elliott's § 1983 claims against the officers, as well as his state law claims against the officers (discussed *infra*), are undermined by undisputed facts that, when approached by the officers, Elliott reached toward his back pockets – one of which contained an unsecured pistol. Elliott's attempts to characterize the situation in any other manner is not supported by the evidence. Officer Bagwell and Officer Vick are due summary judgment on Elliott's § 1983

claims.[5]

**B. State Law Claims Against Officer Bagwell and Officer Vick**

As to the state law claims against Officer Bagwell and Officer Vick, Alabama Code § 6-5-338 (1975), provides for Peace Officer Immunity as follows:

> Every peace officer . . . who is employed or appointed pursuant to the Constitution or statutes of this state . . . shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

ALA. CODE § 6-5-338(a) (1975). Accordingly, under this provision, Officer Bagwell and Officer Vick are shielded from liability for state law tort claims to the extent they were performing a "discretionary function within the line and scope of [their] law enforcement duties." *Id.*

The Alabama Supreme Court has also set out a modified test for determining eligibility for immunity. *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) (plurality), adopted in *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000).

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> . . .
>
> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
>
> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students

---

[5] Even if there was evidence of a constitutional violation, Officer Bagwell and Officer Vick would be entitled to summary judgment on the basis of qualified immunity. Elliott has presented no evidence the officers, who were performing a discretionary function, violated a constitutional right that was clearly established at the time of the incident. *See Saucier v. Katz*, 533 U.S. 194 (2001); *Vinyard v. Wilson*, 311 F.3d 1340, 1346-47 (11th Cir. 2002).

13

*Cranman*, 792 So. 2d at 405.  Thus, "[i]mmunity from tort liability must arise out of the peace officer's performance of 'any discretionary function within the line or scope of his or her' law-enforcement duties." *Swan v. City of Hueytown*, 920 So. 2d 1075, 1078 (Ala. 2005).  "[S]ince the *Cranman* test was adopted we analyze immunity issues under § 6-5-338(a) in terms of 'the principles set forth in *Cranman*." *Ex parte City of Tuskegee*, 932 So. 2d 895, 905 (Ala. 2005) (quoting *Swan*, 920 So. 2d at 1078).  As the Alabama Supreme Court points out, "[t]herefore, conduct involving the 'exercise of judgment in the enforcement of criminal laws' under the *Cranman* standard is also a "discretionary function" under § 6–5–338(a)." *Id.* (citing *Swan*, 920 So. 2d at 1082).

Additionally, the Alabama Supreme Court has explained the "burden-shifting" process that applies when a party raises this defense.  *See Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006).  To claim this immunity, the state agent "bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle [him] to immunity." *Id.*  Once that showing is made, "the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id.*

Officer Bagwell and Officer Vick were performing a discretionary function within the line and scope of their duties when they approached Elliott to discuss his unsecured weapon.  The officers had observed Elliott carrying an unsecured firearm, which was both dangerous and a possible weapons violation.  When approached, Elliott reached toward his back pockets, one of which contained the pistol.  At this point, Officer Bagwell restrained Elliott (as described above) until he could be disarmed.  The officers continued to use their discretion when they walked Elliott out of the gas station to his vehicle.

Elliott's only argument in response to the Peace Office Immunity/State-Agent Immunity

defense is to assert that "discretion does not authorize the excessive use of force and detention of [Elliott] to make an inquiry regarding the right to carry a firearm." (Doc. 15-1 at 11). This argument misstates the undisputed facts of the case. Neither Officer Bagwell nor Officer Vick utilized force to ask Elliott about his firearm and whether he had a concealed carry permit. To the contrary, Officer Bagwell only used force after Elliott reached toward his weapon during the lawful investigatory stop. Elliott presents no evidence that the officers acted "willfully, maliciously, fraudulently, in bad faith, or beyond [their] authority." *Ex parte Estate of Reynolds*, 946 So. 2d at 452.

Because the officers were exercising their judgment in the enforcement of criminal laws, Officer Bagwell and Officer Vick are entitled to Peace Office Immunity as outlined in Alabama Code § 6-5-338(a) and State agent immunity pursuant to the modified test set out in *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000). *See Ex parte City of Tuskegee*, 932 So. 2d 905 (quoting *Swan*, 920 So. 2d at 1078). They are due summary judgment on the state law claims.

Absent immunity, Officer Bagwell and Officer Vick would nevertheless be entitled to summary judgment as to Elliott's state law tort claims because Elliott has failed to present evidence to send any of the state law claims to a jury.

### 1. Count II: Intentional Infliction of Emotional Distress

Elliott contends Officer Bagwell and Officer Vick's actions consisted of "unprivileged conduct that was intentional and of an extreme and outrageous nature" and caused him to suffer "severe emotional distress." (Doc. 1-2 at ¶ 13). To recover for a claim of intentional infliction of emotional distress, Elliott must demonstrate that the officers' conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Ex parte Bole*, 103 So. 3d 40, 52 (Ala. 2012)

(quoting *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)). "[T]he conduct complained of must be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *Green Tree Acceptance, Inc.*, 565 So. 2d 38, 44 (Ala. 1990). To date, the Alabama Supreme Court has recognized three categories of conduct that rise to the level of extreme and outrageous behavior: "(1) wrongful conduct in the family-burial context, (2) barbaric methods employed to coerce an insurance settlement, and (3) egregious sexual harassment . . . ." *Ex parte Bole*, 103 So. 3d at 52.

Neither Officer Bagwell nor Officer Vick's conduct, restraining and disarming Elliott, who reached toward his pistol after a lawful investigatory stop, falls within one of the recognized categories subject to this tort. Additionally, while the officers' actions may have been intentional, there is no evidence that any of their actions were "extreme" or "outrageous," as their actions cannot be considered conduct "utterly intolerable in a civilized society." *Green Tree Acceptance, Inc.*, 565 So. 2d at 44. There is insufficient evidence to send this claim to a jury.

### 2. Count III: Negligence

Elliott alleges "[Officer] Bagwell and [Officer] Vick's aforementioned acts of unwanted touching of [Elliott] were without reasonable justification or excuse, breached said Defendants' duty not to touch [Elliott] in the manner they did . . . and proximately caused [Elliott] to suffer aforementioned harm and damages . . . ." (Doc. 1-2 at ¶ 16). To establish negligence, Elliot must present evidence: "(1) that the defendant[s] owed the plaintiff a duty; (2) that the defendant[s] breached that duty; (3) that the plaintiff suffered a loss or injury; and (4) that the defendant[s'] breach was the actual and proximate cause of the plaintiff's loss or injury." *DiBiasi v. Joe Wheeler Elec. Mbrshp. Corp.*, 988 So. 2d 454, 460 (Ala. 2008).

Elliott's assertion that Officer Bagwell and Officer Vick had a duty not to touch him in the

manner that they did is incorrect.  As established above, there is no evidence that the investigatory stop was unlawful.  During the stop, once Elliott reached toward his firearm, it was justified for the officers to restrain and disarm Elliott, and there is no evidence the use of force was unreasonable.  As noted throughout this opinion, whether Elliott was reaching for the firearm or his wallet is irrelevant.  Because there is no evidence the officers breached a duty owed to Elliott, Officer Bagwell and Officer Vick would be entitled to summary judgment on Elliott's negligence claim even if there was no immunity. Without evidence from which a jury could find a duty and a breach of that duty, there is no need to address the remaining elements of negligence.

### 3.   Count IV: False Imprisonment/False Arrest

Alabama statutory law defines false imprisonment as "the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." ALA. CODE § 6-5-170 (1975). Officer Bagwell and Officer Vick lawfully restrained Elliott with minimal force for less than two minutes.  After the officers observed an unsecured firearm with the barrel exposed through a hole in Elliott's back right pocket, they attempted to approach Elliott as part of a lawful investigatory stop.  At this point, Elliott reached toward his firearm and Officer Bagwell then briefly restrained Elliott. Because the officers' actions were lawful, there is no unlawful detention, and Elliott cannot sustain a claim for false imprisonment.

In Elliott's response, he makes an issue of "arguable probable cause."  (Doc. 15-1 at 13). The issue of "probable cause" misses the mark, because, as Elliott has stated, he was not arrested. As discussed more thoroughly above, officers need only "reasonable suspicion" to perform an investigatory stop.  That is what happened here.  The officers did not implement the use of force until Elliott reached toward his firearm.  Once Elliott reached toward his firearm, the officers were justified in using physical force to detain and disarm him.  Thus, the stop and brief seizure were

lawful and cannot be the basis of a false imprisonment/false arrest claim. Even without immunity, Officer Bagwell and Officer Vick would be entitled to summary judgment on this claim.

### 4. Count V: Assault and Battery

Elliott asserts a claim for assault and battery against Officer Bagwell and Officer Vick. (Doc. 1-2 at ¶21). If an officer's use of force is found to be "reasonable" under the Fourth Amendment excessive force standard, a claim for assault and battery is precluded. *See Walker v. City of Huntsville*, 62 So.3d 474, 494 (Ala. 2010) (holding that the plaintiff's excessive force and assault and battery claims were "identical," and the United States District Court's conclusion that the defendant's use of force was not excessive collaterally estopped the plaintiff from raising her assault and battery claim in state court). As explained and noted throughout this opinion, Elliott has presented no evidence that the officers' use of force was unreasonable. In his response in support of this claim, Elliott takes this opportunity to argue that the assertion he was reaching for his pistol is untrue. (Doc. 15-1 at 13). However, the undisputed evidence, including Elliott's deposition testimony, establishes Elliott reached toward his back pockets, one of which contained an unsecured pistol. (Doc. 13-4 at 35 (134:22-23)). Construing the evidence in the light most favorable to Elliott, even if he was reaching for his wallet in his back pocket, he had an unsecured pistol in his other back pocket. As reasonableness is viewed from the point of view of an officer in the situation, Elliott's intentions are irrelevant. The law does not require an officer to wait and see whether an individual is reaching for his wallet or his weapon. *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). Accordingly, even without immunity, the officers would be due summary judgment on Elliott's assault and battery claim.

### C. 42 U.S.C. § 1983 Claims Against Chief Knight and the City of Pleasant Grove

Elliott asserts claims against Chief Knight and the City of Pleasant Grove for failure to

train and/or supervise Officer Bagwell and Officer Vick. Elliott also asserts claims against Chief Knight and the City of Pleasant Grove for failing to adopt adequate policies and procedures. As it is undisputed Chief Knight did not personally participate in any alleged constitutional violation, the claims asserted against him must be against him in his official capacity (as opposed to his individual capacity). *See McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 n.2 (1997). Accordingly, the claims against Chief Knight in his official capacity are truly claims against the municipality and will be treated as such for purposes of analysis.

### 1. Count VI: Failure to Train/Supervise

"[A] municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.' Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "It is not enough to show that a situation will arise and that taking the wrong course in that situation will result in injuries to citizens." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 490 (11th Cir. 1997) (quoting *Walker v. City of New York*, 974 F.2d 293, 299-300 (2d Cr. 1992)). To demonstrate a municipality's indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 115 F.3d 1346 1350 (11th Cir. 1998).

Deliberate indifference is a "stringent standard of fault" and requires proof that city policymakers disregarded the "known or obvious consequence" that a particular omission in training their personnel would cause city employees to violate citizens' constitutional rights. *Bd.*

*of Cnty. Comm'rs of Bryan Cnty. Okla. v. Brown*, 520 U.S. 397, 410 (1997). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

Even if Elliott had presented an issue of fact as to the existence of a constitutional violation, which he has not, Elliott fails to identify any evidence of deliberate indifference on the part of Chief Knight or the City of Pleasant Grove. The only "evidence" Elliott points to is two unnamed actions against the City of Pleasant Grove and its Police Department in the Northern District of Alabama, alleging excessive force and failure to train. (Doc. 15-1 at 14). Complaints are unproven allegations and, even if Elliott had provided the case names or numbers, such allegations are insufficient to meet the deliberate indifference standard. *See Brooks v. Scheib*, 813 F.3d 1191, 1194 (11th Cir. 1987). Additionally, in his response to the motion for summary judgment, Elliott contends the defendants failed to respond to his interrogatories regarding the subject of grievances, complaints, or disciplinary matters. (Doc. 15-1 at 14). This is the first time Elliot has raised this issue, which should have been brought to the court's attention during discovery if there was a dispute as to the sufficiency of the defendants' discovery responses. As such, Elliott has not provided evidence to support his failure to train/supervise claims, and Chief Knight and the City of Pleasant Grove are entitled to summary judgment on these claims.

### 2. Count VII: Failure to Adopt Adequate Policies and Procedures

Likewise, as to the claims based on a failure to adopt adequate policies and procedures, Elliott fails to present evidence to support his claims. "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell*, 117 F.3d at 489. "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held

liable under § 1983." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (quoting *City of Canton*, 489 U.S. at 389). "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)."

As explained above, deliberate indifference is a "stringent standard of fault" and requires proof that city policymakers disregarded the "known or obvious consequence" that a particular omission in training their personnel would cause city employees to violate citizens' constitutional rights. *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 410. "[A] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.* at 403.

Elliott fails each prong of the *McDowell* test. As to the first prong, that his constitutional rights were violated, Elliott fails to show there is a question of fact that his constitutional rights were violated. To the contrary, there is no clearly established constitutional right to carry a pistol in an unsecured and unsafe manner. Officer Bagwell and Officer Vick legally and lawfully performed an investigatory stop and very briefly restrained Elliott only after he reached for his weapon. As to the second prong of *McDowell*, Elliott has not identified any such municipal policy or custom that caused his injury. Elliott has not presented any evidence that the city policymakers disregarded a "known or obvious consequence" of instituting or failing to institute any policy. Elliott testified he has "no idea" of any of the City's policies regarding use of force or procedure in general. Elliott cannot point to any policy or custom, or a failure to enact a policy or custom, that led to a "known or obvious consequence." For these foregoing reasons, there is no evidence

to support Elliott's claim for failure to enact a policy or custom. The motion for summary judgment is due to be granted, and these claims will be dismissed.

## IV. Conclusion

There being no genuine issues of material fact, the defendants are entitled to summary judgment as to each of Elliott's claims. A separate order will be entered.

DONE this 22nd day of March, 2018.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE